1   SAMUEL KORNHAUSER, Esq., California Bar No. 083528
2   LAW OFFICES OF SAMUEL KORNHAUSER
    155 Jackson Street, Suite 1807
3   San Francisco, California 94111
    Telephone:    (415) 981-6281
4   Facsimile:    (415) 981-7616

5   BRIAN DAVID, Esq., Illinois ARDC No. 0582468
    LAW OFFICES OF BRIAN DAVID
6   33 North LaSalle Street, Suite 3200
    Chicago, Illinois 60610
7   Telephone:    (847) 778-7528
    Facsimile:    (312) 346-8469

8   Attorneys for all Plaintiffs, individually
    and on behalf of all those similarly situated
9

10

11                    **UNITED STATES DISTRICT COURT**

12   **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13

14

15   SERGIO MIRANDA, JEFFREY DOMINGUEZ, )   **Case No. 3:14-cv-5349**
     JORGE PADILLA, and CIRILO CRUZ,          )
16   Individually and on Behalf of All Those  )
     Similarly Situated,                      )   **CLASS ACTION**
17                                            )
                          Plaintiffs,         )
18                                            )   **COMPLAINT FOR VIOLATIONS**
            v.                                )   **OF FEDERAL ANTI TRUST LAWS**
19                                            )
     OFFICE OF THE COMMISSIONER OF            )
20   BASEBALL, an unincorporated association  )   **JURY TRIAL DEMANDED**
     doing business as MAJOR LEAGUE           )
21   BASEBALL, ALLAN HUBER "BUD" SELIG;       )
     KANSAS CITY ROYALS BASEBALL CORP.;       )
22   MIAMI MARLINS, L.P.; SAN FRANCISCO       )
     BASEBALL ASSOCIATES LLC; BOSTON          )
23   RED SOX BASEBALL CLUB L.P.; ANGELS       )
     BASEBALL LP; CHICAGO WHITE SOX           )
24   LTD.; ST. LOUIS CARDINALS, LLC;          )
     COLORADO ROCKIES BASEBALL CLUB,          )
25   LTD.; BASEBALL CLUB OF SEATTLE, LLP;     )
     THE CINCINNATI REDS, LLC; HOUSTON        )
26   BASEBALL PARTNERS LLC; ATHLETICS         )
     INVESTMENT GROUP, LLC; ROGERS            )
27   BLUE JAYS BASEBALL PARTNERSHIP;          )
     CLEVELAND INDIANS BASEBALL CO.,          )
28   L.P.; CLEVELAND INDIANS BASEBALL         )
     CO., INC.; PADRES L.P.; SAN DIEGO        )

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

PADRES BASEBALL CLUB, L.P.;                )
MINNESOTA TWINS, LLC; WASHINGTON           )
NATIONALS BASEBALL CLUB, LLC;              )
DETROIT TIGERS, INC.; LOS ANGELES          )
DODGERS, LLC; LOS ANGELES                  )
DODGERS HOLDING CO.; STERLING              )
METS L.P.; ATLANTA NATIONAL                )
LEAGUE BASEBALL CLUB, INC.; AZPB           )
L.P.; BALTIMORE ORIOLES, INC.;             )
BALTIMORE ORIOLES, L.P.; THE               )
PHILLIES L.P.; PITTSBURGH BASEBALL,        )
INC.; PITTSBURGH BASEBALL P'SHIP;          )
NEW YORK YANKEES P'SHIP; TAMPA             )
BAY RAYS BASEBALL LTD.; RANGERS            )
BASEBALL EXPRESS, LLC; RANGERS             )
BASEBALL, LLC; CHICAGO BASEBALL            )
HOLDINGS, LLC; MILWAUKEE BREWERS           )
BASEBALL CLUB, INC.; MILWAUKEE             )
BREWERS BASEBALL CLUB, L.P.,               )
                                           )
                    Defendants.            )
                                           )

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

**TABLE OF CONTENTS**

I.      NATURE AND BACKGROUND OF SUIT ........................................1

II.     PARTIES ..........................................................................3

        1.      Plaintiffs...........................................................3

        2.      Defendants.......................................................4

III.    CLASS ACTION ALLEGATIONS ...........................................9

IV.     JURISDICTION AND VENUE ..............................................12

        A.      Federal Jurisdiction........................................12

        B.      Venue .............................................................12

V.      FACTUAL ALLEGATIONS ...................................................12

        I.      The Business of MLB .......................................12

        II.     Minor Leaguers' Uniform, Adhesive Contracts ...................13

        III.    The Antitrust Exemption for the "Business of Baseball" ..................20

        IV.     Plaintiffs Have Suffered Antitrust Injury ........................24

VI. COUNT ONE..........................................................................26

        (Damages for Violation of the Sherman Act, – Monopoly, 15 U.S.C. § 2)......26

VII. COUNT TWO .........................................................................27

        (Injunctive Relief - Violation of Section 2 of The Sherman Act) ..................27

VIII. COUNT THREE .....................................................................28

        (Damages -Violation of Section 1 of The Sherman Act)...............................28

IX. PRAYER FOR RELIEF ..............................................................30

X.      DEMAND FOR JURY TRIAL ................................................32

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

This class action is brought by Plaintiffs, Sergio Miranda, Jeffrey Dominguez, Jorge Padilla, and Cirilo Cruz, minor league baseball players ("minor leaguers"), on behalf of themselves and the class of minor leaguers they represent, against the defendants, the cartel of 30 major league baseball clubs and the Commissioner of Major League Baseball (collectively "MLB"), for violations of the Sherman Act and Clayton Act ("antitrust laws").

Plaintiffs allege as follows:

## I.    NATURE AND BACKGROUND OF SUIT

1.    The Defendants [1] are either members of or govern the cartel known as Major League Baseball ("MLB").

2.    MLB openly colludes on the working conditions for the development of its chief commodity: minor league professional baseball players ("minor leaguers"). MLB routinely colludes to violate federal antitrust laws.

3.    In order to monopolize minor leaguers, restrain and depress minor league players' salaries, the MLB cartel inserted a provision (known as the reserve clause) into players' contracts that allows teams to retain for seven (7) years the contractual rights to players and restrict their ability to negotiate with other teams for their baseball services, which reserve clause preserves MLB's minor league system of artificially low salaries and nonexistent contractual mobility.

4.    Unlike major leaguers, minor leaguers have no union or collective bargaining agreement, even though they comprise the overwhelming majority of baseball players employed by the Defendants. The Major League Baseball Players' Association ("MLBPA") does not represent the interests of minor leaguers.

5.    Efforts to unionize minor leaguers have been unsuccessful because minor leaguers fear retaliation by the Defendants. Minor leaguers are afraid to challenge the MLB-imposed wage system, for fear it would jeopardize their careers and potential to become major leaguers if they challenged the system.

---

[1] The term "Defendants" applies to all defendants named in this Complaint.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

6.      Minor leaguers are powerless to combat the collusive power of the MLB cartel. MLB continues to actively and openly collude on many aspects of minor leaguers' working conditions, including, but not limited to, wages, contract terms, and their ability to work for and negotiate with other teams. Major leaguers' salaries have increased by more than 2,000 percent since 1976 while minor leaguers' salaries have, on average, increased only 75 percent since that time. Inflation has risen by more than 400 percent over that same time period.

7.      The federal antitrust laws were enacted to protect competition and prevent conspiracies to restrain competition, including competition for employment, group boycotts, and monopolization.

8.      Through their collective exercise of monopoly power and restraint of trade in the minor league professional baseball player market, Defendants have eliminated competition and suppressed minor leaguers' compensation, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Most minor leaguers earn between $3,000 and $7,500 for the entire year, despite routinely working between 50 and 70 hours per week during the roughly five-month championship season. They receive no overtime pay, and instead, routinely receive less than minimum wage during the championship season.

9.      The Defendants have conspired to pay no wages at all for significant periods of minor leaguers' work. The Defendants do not pay minor leaguers their salaries during spring training, even though the Defendants require minor leaguers to often work over fifty hours per week during spring training. Similarly, the Defendants do not pay salaries during other training periods such as instructional leagues and winter training. [2]

10.     This suit seeks to recoup the damages sustained by minor leaguers as a result of MLB's violations of the antitrust laws, 15 U.S.C. §§ 1, 2, and 15. It seeks to recover damages through an international class action on behalf of minor league professional baseball players to recover treble the additional compensation they should have received absent Defendants' antitrust violations.

_____

[2] *See* Exhibit A attached hereto and incorporated herein, Major League Rules ("MLR") Attachment 3, UPC ¶ VII, B; ¶ VI, B.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

11.     This suit seeks to enjoin Defendants from continuing their antitrust violations.

## II.     PARTIES

### 1.     Plaintiffs

12.     Plaintiff and class representative, Sergio Miranda, was drafted by the defendant Chicago White Sox. The Chicago White Sox subsequently assigned his contract to the defendant Milwaukee Brewers. In 2010, Mr. Miranda played in Brevard County, Florida. In 2011, Mr. Miranda's contract was assigned to Huntsville, Alabama. He is a representative plaintiff on behalf of the Class. During Mr. Miranda's employment as a minor leaguer, he earned less than $10,000 per year while working an average of about 50 hours per week.

13.     Plaintiff and class representative, Jeffrey Dominguez, was drafted by the defendant Seattle Mariners. In 2010, Mr. Dominguez's contract was assigned to Tennessee and subsequently to Tacoma, Washington. In 2011, Mr. Dominguez's contract was assigned to Jupiter Florida and subsequently to Jacksonville, Florida. In 2012, Mr. Dominguez's contract was assigned to New Orleans, Louisiana. He is a representative plaintiff on behalf of the Class. During Mr. Dominguez's employment as a minor leaguer, he earned less than $10,000 per year while working an average of about 50 hours per week.

14.     Plaintiff and class representative, Jorge Padilla, played minor league baseball in Florida during 2012. He is a representative plaintiff on behalf of the Class. During Mr. Padilla's employment as a minor leaguer, he earned less than $10,000 per year while working an average of about 50 hours per week.

15.     Plaintiff and class representative, Cirilo Cruz, was signed by the defendant Houston Astros in 2006.  Mr. Cruz attended spring training in Kissimee, Florida in 2007, 2008, and 2009 from March 1 to April 5 but he did not receive a salary.  Mr. Cruz worked 60 hours per week in spring training and extended spring training.  In 2007 and 2008, Mr. Cruz was assigned to a rookie ball club in Florida and made $3,300 in salary per year despite working in excess of 50 hours per week during those seasons.  Mr. Cruz was released following spring training in 2009 and received no salary that year even though he worked about 60 hours per week from March 1, 2009  to April 1, 2009. Mr. Cruz played minor league baseball in Florida

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

during 2012. He is a representative plaintiff on behalf of the Class. During Mr. Cruz's employment as a minor leaguer, he earned less than $10,000 per year while working an average of about 60 hours per week.

### 2.   Defendants

16.   **The Office of the Commissioner of Baseball, d/b/a MLB.** The Office of the Commissioner of Baseball, doing business as MLB, is an unincorporated association comprised of the thirty Defendant Major League baseball clubs ("the Franchises").[3] MLB has unified operation and common control over the Franchises. All do business as MLB.

17.   MLB employed (and/or continues to employ) the Plaintiff Class of minor leaguers. The Defendants' cartel has developed a unified constitution and unified rules to closely control many fundamental aspects of the minor leaguers' employment, including, *inter alia*, hiring, contracts, wages, periods of wage payment and nonpayment of compensation.

18.   **Allan Huber "Bud" Selig.** Since 1998, Allan Huber "Bud" Selig has served as the Commissioner of Baseball. Mr. Selig is the former owner of an MLB Franchise.

19.   The Commissioner is the "Chief Executive Officer of Major League Baseball."[4] Serving in this capacity, Mr. Selig is the chief bargaining agent for the owners during negotiations with the major league union.[5]

20.   Mr. Selig is also the chief agent for the owners when it comes to forming labor practices involving minor leaguers. Mr. Selig often directs the development of MLB's rules, guidelines, and policies concerning the employment of minor league players. Mr. Selig oversees and closely controls many aspects central to the minor leaguers' employment, including, *inter alia*, hiring, contract terms and mobility.[6]

---

[3] *See* Exhibit B, Major League Constitution ("MLC"), Art. II § 1.

[4] MLC Art. II § 2.

[5] MLC Art. II § 2.

[6] *See* MLR Attachment 3, Minor League Uniform Player Contract ("UPC") ¶¶ VI (describing the conditions of employment), VII (payment of salaries), XXIII (granting Commissioner right to suspend the contract), XXVI (requiring approval by the Commissioner for the contract to have effect); *see also, e.g.*, Addendum C to MLR Attachment 3 (salary form requiring approval by the Commissioner); MLR 4 (giving Commissioner power to

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

21.     The MLB owners elect the Commissioner of Baseball by a vote.[7] They also pay the Commissioner's salary.

22.     Upon information and belief, Mr. Selig also had direct involvement in the implementation of a system to suppress signing bonuses for minor leaguers entering MLB's developmental system for the first time.

23.     **Franchise Defendants.** The below named MLB franchises are defendants in this lawsuit and referred to collectively as the "Franchise Defendants":

24.     *Kansas City Royals.* Kansas City Royals Baseball Corp. (d/b/a "Kansas City Royals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Kansas City Royals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

25.     *Miami Marlins.* Miami Marlins, L.P. (d/b/a "Miami Marlins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Miami Marlins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class. The Miami Marlins were known and operated as the Florida Marlins until changing its name in 2012. Plaintiffs are informed and believe that the Miami Marlins is the successor in interest to the Florida Marlins franchise.

26.     *San Francisco Giants*. San Francisco Baseball Associates LLC (d/b/a "San Francisco Giants") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Francisco Giants employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

27.     *Boston Red Sox.* Boston Red Sox Baseball Club L.P. (d/b/a "Boston Red Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Red Sox of baseball).employed (and/or continue to employ) Plaintiffs, similarly situated

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

oversee the amateur draft, one of the chief avenues of hiring players); MLR 13 (giving Commissioner the power to suspend players); MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR 14 (giving Commissioner the power to accept or deny an application for retirement); MLR 15 (giving Commissioner power to place players on an Ineligible List for misconduct, or to take any other disciplinary action in the best interest of baseball).

[7] MLC Art. II §§ 8, 9.

employees, and/or employees of the Class.

28.    *Toronto Blue Jays.* Rogers Blue Jays Baseball Partnership (d/b/a "Toronto Blue Jays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Toronto Blue Jays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

29.    *Chicago White Sox.* Chicago White Sox Ltd. (d/b/a "Chicago White Sox") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago White Sox employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

30.    *Cleveland Indians.* Cleveland Indians Baseball Co., L.P., and Cleveland Indians Baseball Co, Inc., (d/b/a "Cleveland Indians") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cleveland Indians employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

31.    *Houston Astros.* Houston Baseball Partners LLC (d/b/a "Houston Astros") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Houston Astros employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

32.    *Los Angeles Angels of Anaheim.* Angels Baseball LP (d/b/a "Los Angeles Angels of Anaheim") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Angels of Anaheim employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

33.    *Oakland Athletics.* Athletics Investment Group, LLC (d/b/a "Oakland Athletics") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Oakland Athletics employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

34.    *Seattle Mariners.* Baseball Club of Seattle, LLP (d/b/a "Seattle Mariners") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Seattle Mariners employed (and/or continue to employ) Plaintiffs, similarly situated employees,

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

and employees of the Class.

35.     *Cincinnati Reds.* The Cincinnati Reds, LLC (d/b/a "Cincinnati Reds") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Cincinnati Reds employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

36.     *St. Louis Cardinals.* St. Louis Cardinals, LLC (d/b/a "St. Louis Cardinals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the St. Louis Cardinals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

37.     *Colorado Rockies.* Colorado Rockies Baseball Club, Ltd. (d/b/a "Colorado Rockies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Colorado Rockies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

38.     *San Diego Padres.* Padres L.P., and the San Diego Padres Baseball Club, L.P. (d/b/a "San Diego Padres") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the San Diego Padres employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

39.     *Minnesota Twins.* Minnesota Twins, LLC (d/b/a "Minnesota Twins") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Minnesota Twins employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

40.     *Washington Nationals.* Washington Nationals Baseball Club, LLC (d/b/a "Washington Nationals") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Washington Nationals employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

41.     *Detroit Tigers.* Detroit Tigers, Inc. (d/b/a "Detroit Tigers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Detroit Tigers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

the Class.

42.     *Los Angeles Dodgers.* Los Angeles Dodgers, LLC, and Los Angeles Dodgers Holding Co., (d/b/a "Los Angeles Dodgers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Los Angeles Dodgers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

43.     *New York Mets.* Sterling Mets L.P. (d/b/a "New York Mets") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Mets employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

44.     *Atlanta Braves.* Atlanta National League Baseball Club, Inc. (d/b/a "Atlanta Braves") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Atlanta Braves employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

45.     *Arizona Diamondbacks.* AZPB L.P. (d/b/a "Arizona Diamondbacks") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Arizona Diamondbacks employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

46.     *Baltimore Orioles.* Baltimore Orioles, Inc., and Baltimore Orioles, L.P., (d/b/a "Baltimore Orioles") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Baltimore Orioles employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

47.     *Philadelphia Phillies.* The Phillies L.P. (d/b/a "Philadelphia Phillies") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Philadelphia Phillies employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

48.     *Pittsburgh Pirates.* Pittsburgh Baseball, Inc., and Pittsburgh Baseball P'ship, (d/b/a "Pittsburgh Pirates") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Pittsburgh Pirates employed (and/or continue to employ) Plaintiffs,

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

similarly situated employees, and employees of the Class.

49.     *New York Yankees.* New York Yankees Partnership (d/b/a "New York Yankees") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the New York Yankees employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

50.     *Tampa Bay Rays.* Tampa Bay Rays Baseball Ltd. (d/b/a "Tampa Bay Rays") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Tampa Bay Rays employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

51.     *Chicago Cubs.* Chicago Baseball Holdings, LLC (d/b/a "Chicago Cubs") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Chicago Cubs employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

52.     *Milwaukee Brewers.* Milwaukee Brewers Baseball Club, Inc., and Milwaukee Brewers Baseball Club, L.P., (d/b/a "Milwaukee Brewers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Milwaukee Brewers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

53.     *Texas Rangers.* Rangers Baseball Express, LLC, and Rangers Baseball, LLC, (d/b/a "Texas Rangers") is an MLB Franchise. As a member of Major League Baseball, acting jointly and on its own behalf, the Texas Rangers employed (and/or continue to employ) Plaintiffs, similarly situated employees, and employees of the Class.

## III.    CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring their antitrust claims as a class action under Rule 23(a) and Rule 23(b)1, (b)2, and b(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all other minor league professional baseball players similarly situated. The class is defined as follows:

> All minor leaguers employed by Defendants under uniform player contracts ("UPC") who worked, will work, and/or continues to work as minor leaguers for

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

any minor league team affiliated with a Franchise Defendant at any time between the four years before the filing of this action and its resolution. Excluded from the Class are Defendants and their officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants. Also excluded are the Court and any members of the Court's immediate family, counsel for plaintiffs, as well as persons who submit timely and proper requests for exclusion from the Class.

55.     The Class Representatives are Sergio Miranda, Jeffrey Dominguez, Jorge Padilla, and Cirilo Cruz.

56.     The Proposed Class, consisting of thousands of similarly situated, geographically dispersed minor leaguers, is so numerous that it makes joinder of all members impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that it is in the thousands.

57.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class were and are subject to the same or similar artificially depressed compensation practices arising out of Defendants' conspiracy to restrain competition and depress compensation paid to minor league players, in violation of the federal antitrust laws as alleged herein. Plaintiffs and the Class have sustained similar types of damages, i.e., reduced compensation, as a result of Defendants' antitrust violations.

58.     Plaintiffs will fairly and adequately protect the interests of all members of the Class because they possess the same interests and suffered the same types of damages (depressed compensation) as the other class members. Plaintiffs have retained counsel competent and experienced in class action litigation, including antitrust litigation.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including:

(a) whether Defendants conspired or agreed to force all minor league players to sign uniform player contracts which assigned them to one major league franchise for seven (7) years and prevented them from negotiating or contracting with other competing

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

franchises for their baseball services, in violation of 15 U.S.C. §§ 1 and 2;

(b) whether Defendants imposition of the so called "reserve clause", which prevents minor league baseball players from negotiating or contracting with other teams for their services is a violation of 15 U.S.C. § 1 and/or 2;

(c) whether the nearly hundred year old, so called court-created antitrust "baseball exemption" applies to the reserve clause applied against minor league players and, if it does, whether it should be overturned based on changed circumstances, including, but not limited to, no collective bargaining for minor leaguers.

(d) whether Defendants conspired to require all minor leaguers to sign the same UPC, which controls and depresses minor leaguers' pay in violation of the antitrust laws;

(f) whether the minor leaguers were damaged in the form of lower compensation by Defendants' antitrust violations; and

(g) Whether Defendants have colluded, conspired, agreed and/or acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive or declaratory relief appropriate with respect to the Class as a whole.

60.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and the parties, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense in adjudicating these common claims and issues, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness.

61.     The interest of members of the Class in individually controlling the prosecution of separate actions is impractical. The Class has a high degree of cohesion and prosecution of the action as a representative class action would be unobjectionable. The amounts at stake for

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

Class members, while substantial in the aggregate, are not large enough individually to make it practical to Class members to prosecute their claims individually. As individuals, the class members would lack the resources to vigorously litigate against the ample and powerful resources of the Defendants' cartel. Also, many of the Class members are current minor league players and would not bring an individual action out of fear of retaliation. There would not be any difficulty in the management of this action as a class action. The members of the Class are employed by and known to Defendants. The Class members are readily identifiable, and can be located through Defendants' own records.

## IV. JURISDICTION AND VENUE

### A. Federal Jurisdiction

62. Plaintiffs bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, premised on Defendants' violation of the Sherman Act, 15 U.S.C. §§ 1, 2. This Court has subject matter jurisdiction over these claims pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331 and 1337(a).

### B. Venue

63. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Defendants transact business in this District and are subject to personal jurisdiction in this District.

## V. FACTUAL ALLEGATIONS

### I. The Business of MLB

64. MLB is big business. Its games are broadcast throughout the United States. During the 2013 season, over 74 million fans paid to attend MLB games.

65. In 2012, revenue for MLB and its thirty teams surpassed $7.5 billion. Annual revenue is expected to reach $9 billion dollars in 2014.[8]

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[8] *See* Maury Brown, *MLB Revenues $7.5B for 2012, Could Approach $9B by 2014*, Biz of Baseball (Dec. 10, 2012), http://www.bizofbaseball.com/?catid=30:mlb-news&id=5769:mlb-revenues-75b-for-2012-could-approach-9b-by-2014&Itemid=42&option=com_content&view=article.

66.      Franchise values for the thirty MLB teams have grown as well. The average value of the thirty Franchises is estimated at $744 million each.[9]

67.      The baseball players employed by the Defendants account for much of this rise in revenue, as they comprise the chief product offered by MLB and its teams. Without baseball players, MLB and its teams would not exist. Yet MLB and its Franchises pay most players – the minor leaguers – depressed compensation through the use of forced UPCs and the reserve clause which restricts competition by preventing minor leaguers from fairly negotiating to receive higher compensation.

## II.      Minor Leaguers' Uniform, Adhesive Contracts

68.      Since the 1920s, all MLB teams have used an extensive "farm system" to develop players. MLB teams employ a small number of major leaguers that perform in MLB stadiums at the game's highest level. MLB Rules allow Franchises to only maintain 25 major leaguers on an "active roster" and a few additional players reserved on the "40-man" roster. A few more players are inevitably on the major league disabled list, so each Franchise employs a little over 40 major leaguers.

69.      But each Franchise simultaneously stockpiles around 150 to 250 minor leaguers that perform at the minor league levels of baseball. It is estimated that, at any given time, the Defendants collectively employ around 6,000 minor leaguers total. The Defendants employ this high number of minor leaguers in their farm systems, hoping some will eventually develop into major leaguers.

70.      Minor leaguers have no union. Without a union to counteract MLB's power, MLB and its teams have exploited minor leaguers by, among other things, continuing to promulgate and impose oppressive rules on minor leaguers' entry into the industry, restriction of movement to other teams, and on contracts, salaries, and compensation.

71.      The MLB teams acquire minor leaguers in one of two ways: through an amateur

---

[9] Mike Ozanian, *Baseball Team Valuations 2013: Yankees on Top at $2.3 Billion*, Forbes (Mar. 27, 2013), http://www.forbes.com/sites/mikeozanian/2013/03/27/baseball-team-valuations-2013-yankees-ontop-at-2-3-billn/.

draft or through free agency.

72.     The amateur draft, known as MLB's Rule 4 draft,[10] occurs in June of each year. In 1965, Commissioner Ford Frick oversaw the development and implementation of what is now the Rule 4 draft. By forcing amateur players to participate in the draft, MLB and its Commissioner limited those players seeking to enter MLB's developmental system to only negotiating with a single team. Thus, signing bonuses declined.[11]

73.     Upon information and belief, Bud Selig sought to further curb signing bonuses for draftees in the late 1990s. Acting in his capacity as chief labor agent,[12] he directed the development and implementation of an informal "slotting" system with recommended signing bonuses for each high level pick. To enforce the mechanism, Mr. Selig required a Franchise's scouting director to call the Commissioner's office prior to exceeding the recommended slot level. This requirement of approval is an outgrowth of MLB's rules, which require all minor league contracts to be filed with and approved by Mr. Selig.[13]

74.     A new, stricter system was instituted in 2012. The current system places limits on the amounts Franchises can spend on signing bonuses.

75.     MLB's current Rule 4 draft, as developed and enforced by the Commissioner, requires all amateur players from the United States, Canada, and Puerto Rico to participate in the draft in order to sign with an MLB team.[14] Beginning with the worst MLB team from the previous season, teams select amateur players over the course of forty rounds.

76.     Players selected in the Rule 4 draft are between the ages of 18 and 22 (with the exception of a few players who are 23). Once selected by a Franchise, a player cannot bargain

---

[10] MLR 4.

[11] MLB teams offer large signing bonuses to the most talented amateur players as an incentive to forego college. Only the very top amateurs, however, receive large signing bonuses. The majority of amateurs signed through the draft receive quite small signing bonuses, usually around $2500.

[12] MLC Art. II § 2.

[13] *See* MLR 3(e) (requiring all contracts to be approved by the Commissioner); MLR Attachment 3, UPC ¶ XXVI (requiring approval by the Commissioner for the contract to have effect).

[14] MLR 4(a).

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

with any other Franchise, as MLB's rules grant the drafting Franchise exclusive rights to the player.[15]

77.     In addition to the draft, teams acquire previously amateur Latin American players through free agency. MLB rules allow the Franchises to sign the players as early as age sixteen, so most Latinos are either sixteen or seventeen when signing with a Franchise.[16]

78.     Most Latino minor leaguers come from poor families and have only the equivalent of an eighth grade education. Before signing, many are only represented by similarly-educated "buscones"—usually former players who maintain training facilities for young amateur players. Some of the Franchises' scouts have been reprimanded in recent years for participating in bribes and kickback schemes with the buscones, and the FBI has even investigated the exploitative practices.[17] These Latino signees comprise over forty percent of minor leaguers.

79.     Similar to the slotting system, Mr. Selig also personally oversaw the development of bonus pools for Latino players in an effort to curtail Latino signing bonuses. Instituted in 2012, Mr. Selig's plan allows each Franchise a certain amount to spend on signing bonuses for Latino players.

80.     Teams also sign additional players from the United States, Canada, and Puerto Rico who were not drafted in the Rule 4 draft.[18] MLB rules place limits on when such free agent acquisitions can occur. Since they were not selected in the draft, they are viewed as less skilled amateur players and, even as free agents, have no bargaining power.

81.     Defendants require all teams to use the same uniform player contract ("UPC") when signing amateur players. MLR 3(b)(2) states:

> To preserve morale among Minor League players and to produce the similarity of conditions necessary for keen competition, all contracts…shall be in the form

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[15] MLR 4(e).

[16] *See* MLR 3(a).

[17] *See* Jorge L. Ortiz, *Exploitation, steroids hitting home in Dominican Republic*, USA Today (Mar. 26, 2009), http://usatoday30.usatoday.com/sports/baseball/2009-03-26-dominican-republic-cover_N.htm.

[18] MLR 4(i).

of the Minor League Uniform Player Contract that is appended to these Rules as Attachment 3. All Minor League Uniform Player Contracts between either a Major or a Minor League Club and a player who has not previously signed a contract with a Major or Minor League Club shall be for a term of seven Minor League playing seasons….The minimum salary in each season covered by a Minor League Uniform Player Contract shall be the minimum amount established from time to time by the Major League Clubs….

82.     Moreover, "[a]ll contracts shall be in duplicate," and "[a]ll…must be filed with the Commissioner…for approval."[19] No contract can vary any term without the approval of the Commissioner.[20] A minor leaguer cannot work for an MLB team without signing the UPC because a "player's refusal to sign a formal contract shall disqualify the player from playing with the contracting Club or entering the service of any Major or Minor League Club."[21]

83.     Thus, the UPC grants the MLB team the exclusive rights to the minor leaguer for seven championship seasons (about seven years).[22] During that time period, the MLB team may assign the minor leaguer's rights to any other team, and the MLB team may terminate the agreement at any time for almost any reason.[23]

84.     But the minor leaguer cannot leave voluntarily to play for another baseball team—even outside of MLB, and even outside of the United States.[24] A player doing so "shall be subject to the discipline of the Commissioner."[25] Retirement from baseball during the seven-year term requires the Commissioner's approval.[26]

85.     The UPC restricts a player in the minor leagues of a single organization. A minor leaguer selected in the amateur draft can only sign with the MLB team that drafted him. For the next seven years, the MLB team controls the minor leaguer's rights. By the expiration

---

[19] MLR 3(b)(3); *see also* MLR 3(b)(4) (saying that a player cannot play until the UPC is signed).

[20] MLR 3(b)(3).

[21] MLR 3(d).

[22] MLR 3(b)(2); MLR Attachment 3, UPC ¶ VI.A.

[23] MLR 9; MLR Attachment 3, UPC ¶ XVIII.

[24] MLR 18; MLR Attachment 3, UPC ¶ XVI.

[25] MLR 18.

[26] MLR 14.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

of the contract, much of the value of the minor leaguer as a young prospect has expired because the player has aged.

86.     Since the signing of a 1962 Player Development Plan, MLB requires MLB Franchises to maintain a certain number of minor league teams. Currently, all MLB teams have minor league teams at all the levels of the minor leagues, with most having either seven or eight minor league teams.

87.     Often the MLB Franchises do not operate the minor league stadium but instead sign agreements with owners of minor league teams. These agreements are known as Player Development Contracts ("PDC"), and the teams are affiliates of the MLB Franchises.

88.     MLB rules make clear that MLB and its Franchises remain the employers of minor leaguers at all times when using PDCs. MLR 56(g) states:

> The players so provided shall be under contract exclusively to the Major League Club and reserved only to the Major League Club. The Minor League Club shall respect, be bound by, abide by and not interfere with all contracts between the Major League Club and the players that it has provided to the Minor League Club.

89.     Moreover, MLB requires the MLB Franchise to pay the salaries of the minor league players at all times and allows the MLB Franchise the ability to control assignments.[27]

90.     Since minor leaguers do not belong to a union, nothing has prevented the Defendants from artificially and illegally depressing minor league wages. Because of Defendants' monopoly over the entryway into the highest levels of baseball, and given the young minor leaguer's strong desire to enter the industry, Defendants have exploited minor leaguers by paying them depressed compensation, below what they would receive in a competitive market.

91.     Plaintiffs are informed and believe that Defendants, through the Commissioner, issue minor league salary "guidelines" for players signed to an initial UPC, and teams deviate very little from these guidelines. MLR 3(c) requires that all first-year minor leaguers earn "the amount established by" MLB.[28] It is currently believed that all first-year minor leaguers

---

[27] MLR 56(g).

[28] As the 2013 Miami Marlins Minor League Player Guide states, "all first-year players receive $1,100 per month regardless of playing level per the terms of the [UPC]."

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

employed by the Defendants must earn $1,100 per month.

92.     Salaries beyond the first year are very similar across all Franchises. It is believed that discussions regarding minor league salaries (and other working conditions concerning minor leaguers) occur when MLB hosts its quarterly owner meetings that all Defendants attend.

93.     While salary guidelines are not publicly available, the Plaintiffs are informed and believe, based on the salaries paid by the Defendants across the minor leagues, that MLB currently imposes the following salaries, paid only during the championship season:  $1,100 per month for Rookie and Short-Season A; $1,250 per month for Class-A; $1,500 per month for Class-AA; and $2,150 for Class-AAA.

94.     Beyond the first year, the UPC required by MLB, and enforced by Mr. Selig, purports to allow salary negotiation by the minor leaguer, as the UPC states that salaries will be set out in an addendum to the UPC and subject to negotiation.[29] But the same UPC provision states that if the Franchise and minor leaguer do not agree on salary terms, the Franchise may unilaterally set the salary and the minor leaguer must agree to it.[30]

95.     In truth, then, the UPC—and Mr. Selig as enforcer—does not allow for minor league salary negotiations. It is believed that the Franchises simply follow MLB's salary guidelines, and the minor leaguers must accept them. As the 2013 Miami Marlins Minor League Player Guide states, "This salary structure will be strictly adhered to; therefore, once a salary figure has been established and sent to you, there will be NO negotiations."

96.     MLB also centrally controls when and how minor leaguers are paid. During the championship season, the Franchises must pay minor leaguers "in two (2) semi-monthly installments on the 15th day and last day of the month."[31]

97.     The UPC required by MLB, and enforced by Mr. Selig, further states that salaries are only to be paid during the championship season, which lasts about five months out

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[29] MLR Attachment 3, UPC ¶ VII.A.

[30] MLR Attachment 3, UPC ¶ VII.A.

[31] MLR Attachment 3, UPC ¶ VII.B.

of the year. [32] Plaintiffs believe that most minor leaguers earn less than $7,500 per calendar year. Some earn $3,000 or less. Despite only being compensated during the approximately five-month championship season, MLB's UPC "obligates minor leaguers to perform professional services on a calendar year basis, regardless of the fact that salary payments are to be made only during the actual championship playing season." [33] Consistent with that obligation, the UPC states that "Player therefore understands and agrees that Player's duties and obligations under this Minor League Uniform Player Contract continue in full force throughout the calendar year."

98.     The Defendants' application of the UPC, requires the minor leaguer to participate in spring training.[34] Again, the UPC does not allow for salaries during this period since spring training falls outside the championship season, so minor leaguers work without earning a paycheck. The spring training season usually lasts around one month, during the month of March, but it sometimes lasts longer.

99.     Around 30–50 minor leaguers per MLB Franchise do not earn a roster spot on a minor league team at the end of spring; they instead remain at the Franchise's spring training site in "extended spring training." Since they are not participating in a championship season, MLB's UPC again does not require salaries to be paid.[35] Upon information and belief, many of these players will not earn paychecks until the end of June, when the Rookie and Short-Season A leagues begin. Thus, many minor leaguers are not paid for work performed during March, April, May, and most of June.

100.     At the end of the championship season, around 30–45 minor leaguers per MLB Franchise are also selected to participate in an instructional league to further hone their skills. Again, MLB's UPC—as approved and enforced by Mr. Selig—requires minor leaguers to

---

[32] MLR Attachment 3, UPC ¶ VII.B. ("Obligation to make such payments to Player shall start with the beginning of Club's championship playing season…[and] end with the termination of Club's championship playing season….").

[33] MLR Attachment 3, UPC ¶ VI.B.

[34] *See* MLR Attachment 3, UPC ¶ VI.B. (saying that the UPC applies to the "Club's training season").

[35] MLR Attachment 3, UPC ¶ VII.B.

perform this work without pay since it is outside the championship season, so the minor leaguers receive no paychecks during the instructional league.[36] The instructional leagues usually last around one month.

101.     MLB's UPC also requires minor leaguers to maintain "first-class" conditioning throughout the calendar year[37] because the player's "physical condition is important to…the success of the Club."[38] Consequently, a "Club may require Player to maintain Player's playing condition and weight during the off-season and to report for practice and condition at such times and places as Club may determine."[39] If the player fails to meet these requirements, the "Club may impose a reasonable fine upon Player…."[40]

102.     The Defendants therefore require players to perform extensive training and conditioning during the winter off-season. It is believed that all Franchises direct the winter work by issuing training packets to all the players. Many, and perhaps all, Franchises monitor workouts and punish players for not performing off-season workouts. Minor leaguers receive no wages during this training period because it is outside the championship season.[41]

### III.     The Antitrust Exemption for the "Business of Baseball"

103.     The Defendants seek to avoid their "reserve clause" and UPC antitrust violations under the judicially created exemption from the antitrust laws under the <u>Federal Baseball</u>,[42] <u>Toolson</u>,[43] and <u>Flood</u> [44] trilogy of Supreme Court cases. That judicially created exemption has

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[36] MLR Attachment 3, UPC ¶ VII.B.

[37] MLR Attachment 3, UPC ¶ XII.

[38] MLR Attachment 3, UPC ¶ VI.D.

[39] MLR Attachment 3, UPC ¶ VI.D.

[40] MLR Attachment 3, UPC ¶ VI.D.

[41] *See* MLR Attachment 3, UPC ¶ VII.B.

[42] Fed. Baseball Club of Baltimore v. Nat'l League of Prof'l Base Ball Clubs, 259 U.S. 200 (1922).

[43] Toolson v. New York Yankees, Inc., 346 U.S. 356 (1953).

[44] Flood v. Kuhn, 407 U.S. 258 (1972)

long since been criticized, even by the Supreme Court itself.[45] The exemption no longer has, if it ever had, any current basis in economic reality, especially for the market in minor league professional baseball players' compensation where minor leaguers have no union, no collective bargaining, no free agency or other means of fairly negotiating for their services.

104.     The judicially created "baseball exemption" from the antitrust laws no longer has any underpinning. The initial rationale, that professional baseball's cartel was not engaged in interstate commerce and was therefore not subject to federal antitrust regulation, has since been rejected by the Supreme Court, in its decision in <u>Flood</u> v. <u>Kuhn</u>, 407 U.S. 258 (1972). The stare decisis rationale and the rationale that  Congress, not the courts should redress the baseball exemption also have no basis. Congress did address the issue in 1890, when it enacted the Sherman Act to outlaw restraints on trade and the exercise of monopoly power that harm competition. There is no need for Congressional legislation, it already exists.

105.     The "baseball exemption" allows the Defendants to conspire and collude, through the "reserve clause" and uniform player contracts, to prevent minor league baseball players from shopping their services to competing teams. It results in the per se antitrust violation of price fixing, at artificially low levels, the compensation minor league players can receive, by preventing minor league players from offering their services to competing teams who, in a competitive market, would offer them more for their services. The Defendants have a monopoly in the provision of professional baseball games and the players that produce those games. Defendants reap huge financial rewards as a result of their monopoly power and restraints on competition. The minor league players who have no union, no collective bargaining, and no free agency, are at a competitive disadvantage and need the protection of the antitrust laws to stop the financially superior Defendants from continuing to give the minor league players the short end of the bat.

106.     Plaintiffs seek relief under the federal antitrust laws in connection with a threatened loss resulting from the unlawful exercise of market power by MLB in the market for minor league men's professional baseball contracts in the United States, Mexico, Canada and

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

---

[45] Justice Douglas in <u>Flood</u>, supra 407 U.S. at 286, summed it up. "This Court's decision in <u>Federal Baseball Club</u>…is a derelict in the stream of the law that we, its creator, should remove."

the Caribbean. MLB is excluding competition and restraining trade in that market through the application of unreasonable restrictions on minor league player compensation by preventing Defendants from negotiating, contracting, paying and competing for minor league players.

107.     MLB is made up of competitive member teams and has market power in the provision of minor league professional baseball games in North America and Latin America. Use by Defendants of the reserve clause, the UPC, and draft, which grants each Club absolute veto power and control over their minor league players' ability to negotiate and contract for higher compensation with other teams, are unreasonable, unlawful, and anticompetitive restraints under Section 1 of the Sherman Act.

108.     Through MLB and the exclusionary and anticompetitive provisions in the MLB Constitution, Defendants have conspired to violate the antitrust laws, and have willfully acquired and maintained monopoly power in violation of Section 2 of the Sherman Act within the market for minor league professional baseball players by preventing such minor league players from freely negotiating with other teams for their services and the compensation they should receive.

109.     MLB is comprised of thirty separately owned and operated major league men's baseball clubs in the United States and Canada. The MLB, like other sports leagues, have structured their governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made by the club owners themselves. In so doing, the owners act in their own economic self-interest, including entering into a series of agreements that eliminate, restrict, and prevent off-field competition. These anticompetitive agreements go far beyond any cooperation reasonably necessary to provide minor league men's professional baseball contests to consumers.

110.     This action challenges — and seeks to remedy — Defendants' violation of the federal antitrust laws and the use of the illegal cartel to institute and maintain the reserve clause and UPC as a means to stifle competition and suppress the compensation that minor leaguers receive, which would be significantly higher absent Defendants antitrust violations, which eliminate competition in the payment of minor leaguers. Not only are such agreements not

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

necessary to producing baseball contests, they are directed at reducing the compensation paid to minor leaguers by eliminating competition for their services.

111.     These violations of laws and restraints are not necessary to maintain a level of competitive balance within the league that fans prefer, or to maintain the viability of Defendants.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

### VII.   The Agreements Have Restrained Competition And Have Had Anticompetitive Effects And Led To Consumer Harm

112.     The above-described agreements have restrained horizontal competition between and among the Defendants and the MLB, including in the procurement of, and payment of compensation to, minor league players where the Clubs could and would compete with each other. In particular, in the absence of the reserve clause restrictions and other competitive restraints, Defendants would compete with each other in the acquisition of, and compensation to minor league players to a much greater extent than they do now.

113.     The above-described agreements have adversely affected and substantially lessened competition in the relevant markets for minor league baseball players.

114.     Competition by individual Defendants independently acting to acquire and retain minor league players would benefit the minor league players by providing them better and competitive compensation.

115.     There are no legitimate, pro-competitive justifications for these anti competitive restrictions on compensation and the inability of minor league players to offer their services to teams that will compete for their services and pay them higher compensation.

116.     Defendants have misused the UPC and reserve clause for anticompetitive and unlawful purposes. The adverse effects of such misuse are continuing, and the UPC restrictions on compensation and player movement should be enjoined and declared unenforceable.

### IV.   Plaintiffs Have Suffered Antitrust Injury

117.     Plaintiffs and the Class have suffered cognizable antitrust injury under the Sherman Act. There has been injury to competition in the relevant product market, which is the market for professional minor league baseball players. Defendants, through their minor league affiliate teams, should, but do not compete for minor league players.

118.     Defendants' actions have placed direct and indirect restraints on the acquisition, movement, and payment of minor league players, all of which directly and indirectly affect interstate commerce. Major League Baseball is an unreasonable and unlawful monopoly created, intended and maintained by Defendants for the purpose of permitting an intentionally select and limited group, the Defendants, to reap enormous profits. MLB has achieved these

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

restraints on trade and its monopoly status by engaging in an unlawful combination and conspiracy, the substantial terms of which have been to eliminate all competition in the relevant market for minor league players, to exclude and prevent them from obtaining fair, competitive compensation for their services, to establish monopoly control of the relevant market for minor league players and to unreasonably restrain trade by conspiring to fix, at below market value, the compensation paid to minor league players.

119.     Defendant's unlawful activities have resulted in (a) an unlawful restraint of trade in minor league players' compensation; (b) the elimination of competition for minor league players' services by fixing the compensation minor league players receive and by eliminating competition through the exercise of MLB's exclusive, dominant and monopoly position in the minor league (and major league) professional baseball market.

120.     As a result of Defendants' anticompetitive agreements, Plaintiffs and the Class are injured because minor league players are prevented from obtaining fair competitive compensation for their baseball services and are denied the freedom of movement available to players in virtually every other professional sport in the United States.

121.     Plaintiffs' injuries are also injuries to the public and to competition. The major league teams lose the ability to field more competitive teams, the fans lose out on viewing a better baseball product, and the economy loses increased tax revenue, jobs, and business growth by increased player purchasing power.

122.     While the full amount of Plaintiffs' damages are not presently known, they will be calculated after discovery and will be awarded based on proof at trial. The combination and conspiracy alleged herein has injured Plaintiffs and the Class and continues to threaten the Class with loss or damage in lower compensation than they would receive in a competitive market.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

# VI. COUNT ONE

## (Damages for Violation of the Sherman Act, – Monopoly, 15 U.S.C. § 2)

123.     Plaintiffs incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 122 above.

124.     Defendants and their co-conspirators created, operated, aided, or abetted a trust, combine, or monopoly for the purpose of creating and carrying out restrictions on trade or commerce with the purpose, intent, and effect of restraining horizontal competition among the Defendants and the MLB for the acquisition of and compensation paid to minor league professional baseball players.

125.     The trust, combination, or monopoly has resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators that suppresses the compensation paid to minor league players.

126.     The trust, combination, or monopoly has resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators to suppress the compensation paid to minor league players.

127.     By virtue of the exclusionary and anticompetitive UPC (which all minor league players are required to sign) and the reserve clause of the MLB Constitution, Defendants, through MLB, have willfully acquired and maintained monopoly power in the relevant market by blocking the movement of and ability to negotiate and receive competitive compensation for minor league players, thereby preventing competition in the relevant market.

128.     The Defendants, which should be actual competitors in the market for minor league men's professional baseball players, have conspired with and through MLB, through the monopolistic use of the UPC and "reserve clause" to maintain a monopoly power over these minor league players by refusing to allow them to negotiate with or move to or offer their services to other minor league teams, thereby restricting trade and commerce, limiting competition within the market area, and controlling at depressed below competitive compensation paid to minor league players.

129.     Through the anticompetitive conduct described herein, Defendants and their co-

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power over the market for minor league players by anticompetitive and unreasonably exclusionary conduct. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant market, and their illegal conduct has enabled them to do so, in violation of the Sherman Act, 15 U.S.C. § 1.

130.    Plaintiffs and the Class have suffered an ascertainable loss of money or property as the result of the actions of Defendants and their co-conspirators, including but not limited to the loss of competitive, higher compensation they would have received in a competitive market absent Defendants' anticompetitive actions.

131.    The conduct of Defendants and their co-conspirators is a substantial factor in Plaintiffs' loss. The loss was a direct and proximate result of the willful conspiracy of Defendants and their co-conspirators to monopolize, restrain trade and lessen competition.

132.    Because Defendants and their co-conspirators created, operated, aided, or abetted a trust with the purpose of lessening competition in the business of minor league baseball. Plaintiffs seek damages and injunctive relief pursuant to 15 U.S.C. §§ 1, 2, 15. Pursuant to the Clayton Act, 15 U.S.C. § 15, Plaintiffs are authorized to recover three times the damages they sustained plus interest.

133.    As a direct and legal result of the acts of Defendants and their co-conspirators, Plaintiffs were forced to file this action, resulting in ongoing attorneys' fees, costs, and other expenses for which they seek recovery according to proof.

## VII. COUNT TWO

### (Injunctive Relief - Violation of Section 2 of The Sherman Act)

134.    Plaintiffs incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 133 above.

135.    Defendants possess monopoly power in the market for minor league men's

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

professional baseball players.

136.     By virtue of exclusionary and anticompetitive provisions in the UPC and MLB Constitution, including the "reserve clause", Defendants have willfully acquired and maintained monopoly power in the relevant market by blocking the movement of minor league players and their ability to negotiate and receive competitive compensation for their services, thereby preventing competition in that market.

137.     Defendants (which should be actual competitors in the market for minor league men's professional baseball players) have conspired with and through MLB to maintain a monopoly power in the market for minor league players by unreasonably refusing to allow them to move from the clubs that drafted them or to negotiate for compensation.

138.     Through the anticompetitive conduct described herein, Defendants and their co-conspirators have willfully acquired and maintained, and unless restrained by the Court, will continue to willfully maintain, that monopoly power over the market for minor league baseball players by anticompetitive and unreasonably exclusionary conduct. These activities have gone beyond those which could be considered as "legitimate business activities," and are an abuse of market position. Defendants and their co-conspirators have acted with an intent to illegally acquire and maintain that monopoly power in the relevant market, and their illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

139.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury to Plaintiff and the Class, as set forth above. Plaintiffs and the Class will continue to suffer antitrust injury and threatened loss or damage unless Defendants are enjoined from continuing to engage in the above described violations of the antitrust laws.

## VIII. COUNT THREE

### (Damages -Violation of Section 1 of The Sherman Act)

140.     Plaintiffs incorporate and reallege, as though fully set forth herein, Paragraphs 1 through 139 above.

141.     Beginning at a time presently unknown to Plaintiffs, and continuing through the

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

present, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade with the purpose, intent, and effect of restraining horizontal competition among the Defendants and the MLB, with the purpose, intent, and effect of restraining trade and commerce in the employment of and compensation paid to minor league professional baseball players, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.     The contract, combination or conspiracy has resulted in an agreement, understanding, or concerted action between and among Defendants and their co-conspirators that minor league players are restrained and prevented from playing for and negotiating for compensation from other minor league professional baseball teams.

143.     The contract, combination, or conspiracy has restrained competition between and among Defendants in violation of Section 1 of the Sherman Act. It has led to anticompetitive effects in the relevant markets resulting in below competitive compensation to minor leaguers, as alleged above and has caused injury to competition in those relevant markets and elsewhere.

144.     Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

145.     Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of lower compensation (or no compensation) to minor league players than they would have received absent Defendants' antitrust violations, as set forth above.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

# IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, pray as follows:

A. This Court declare the conduct of Defendants, and each of them, constituted a conspiracy and that Defendants, and each of them, are liable for the conduct of or damage inflicted by any other co-conspirator;

B. Defendants, and each of them, be permanently enjoined from enforcing the "reserve clause" which unlawfully restricts the movement by and compensation paid to, minor league players;

C. The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

D. The actions of Defendants and their co-conspirators to illegally acquire and maintain monopoly power in the relevant product market be adjudged to have been in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

E. Judgment be entered for Plaintiffs and the Class and against Defendants for three times the amount of damages sustained by Plaintiffs as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

F. Plaintiffs be awarded pre judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

G. Defendants and their co-conspirators be enjoined from further violations of the antitrust laws;

H. Designation of the named Plaintiffs herein as class representatives of the Class, designation of their undersigned counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiffs; and

I. Plaintiffs have such other, further relief, as this Court may deem just and proper under the circumstances.

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

DATED: December 5, 2014                LAW OFFICES OF SAMUEL KORNHAUSER

                                                                    and

                                              LAW OFFICES OF BRIAN DAVID


                                              By: _____/s/ Samuel Kornhauser_____
                                                      Samuel Kornhauser
                                                      Attorney for Plaintiffs and
                                                      those similarly situated

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111

# X.     DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.


DATED: December 5, 2014                     LAW OFFICES OF SAMUEL KORNHAUSER

and

LAW OFFICES OF BRIAN DAVID


By:    /s/ Samuel Kornhauser
                                            Samuel Kornhauser
                                            Attorney for Plaintiffs and
                                            those similarly situated

LAW OFFICES
SAMUEL KORNHAUSER
155 Jackson Street, Suite 1807
San Francisco, CA 94111